Salaya Because the BIA found the petitioner credible, there is no dispute regarding the facts of this case. Four members of the New People's Army invaded Petitioner's home where they attacked her father, they beat her mother until she was unconscious, they beheaded the family dog, they kidnapped Petitioner and took her to a remote location, where they proceeded to subject her to multiple gang rapes over a three-day period. They forced her to perform oral sex, they hung her upside down naked, they cut her, poured hot wax over her, burned her with cigarettes, and then eventually released her after three days, where the first thing that she did was to try to take her own life when she was released from her binding. She was sent to Manila to be with her sister after this ordeal, where she learned that she was pregnant as a result of the multiple rapes. When she learned this, she tried to abort the fetus and tried to again take her own life. The baby was born and she was too traumatized to care for the child, and so the baby was sent away, and because of the multiple traumas that she faced, Petitioner was not able to live in Manila, and so she was sent to the U.S. where she applied for asylum. The question for this court is whether these horrific traumas that took place were on account of a protected ground. There are two possible protected grounds here. The first is based on political opinion, specifically imputed political opinion. Her father's? Her father's, correct. Her father's status as a war veteran in support of the Philippine government. And the second is based on a particular social group, that being unmarried women in towns controlled by the NPA. If the court finds that there is targeting based on imputed political opinion, it need not reach the latter ground. Now the record clearly shows that Petitioner was at least in part targeted on account of her father's political opinion. Her declaration establishes that the NPA soldiers knew who her father was when they met with her after she got off the bus. It further establishes that when she was kidnapped, the NPA said, we know your father's a war veteran. And when Petitioner was being tortured by the NPA soldiers, she was told they're doing this so that she will learn her lesson. This is similar to the petitioners in Garcia Martinez, in Lopez Umanzor, in Ali, all rape victims who were targeted in part on account of their family's political opinions. Now the BIA overturned the immigration judge's decision on credibility, and yet it never addresses these three parts, which were fully briefed to the board. The board cites Petitioner's declaration five times, yet never cites these specific facts which show imputed political opinion, and in fact never engages in the mixed motive analysis that's required by Briones and Borja. Now the government relies on the Ochave decision to support its position, but Ochave actually supports Petitioner's contention. In Ochave, the court found that there was no nexus for the Petitioner's rape. But the court says, the fact remains that there is nothing in this record even to hint that the rapist knew at the time of the rape who the Petitioner's family was. The court in Ochave says, in order to impute a political opinion to the victim on account of the family's activities, a rapist necessarily must have some idea who the victim is. The court says that nothing in the record shows that the rapist knew about her or said anything about the father's politics during or before or after the rape. Here we have specific statements by the NPA that they knew who Petitioner's father was, that they knew he was a war veteran, and that she was being targeted so she will learn her lesson. In addition, unlike Ochave, Petitioner was subject to a kidnapping where the NPA came specifically to her house and apprehended her, whereas in Ochave it was an open, the rape took place in an open area, and so the court said that Ochave was not specifically being targeted. Here the board erred again in failing to apply the mixed motive analysis and failing to consider these relevant factors in the declaration. But if the court finds that there was no nexus on imputed political opinion, it then should go to the social group analysis, here the social group being unmarried women in areas controlled by the NPA. Now the board relies on Sanchez-Trujillo, but that, Sanchez-Trujillo is only part of the analysis. In Hernandez-Montiel, this court was very clear that there are actually two components to the particular social group analysis. One is the one based on voluntary association that was addressed in Sanchez-Trujillo, but the other is based on immutable characteristics. And in Hernandez-Montiel, the court for the first time found that immutable characteristics component. There it found that gay men who identified as women were a social group. Later in Mohammed, the court then finds that Somali women are a particular social group for purposes of their being targeted for female genital mutilation. And your social group is what? Is young, I'm sorry, is unmarried women in areas controlled by the NPA. Immutable. That's true, Your Honor. I think the key here is women. So your group boils down to women. Yeah, it is analogous to the Mohammed decision, Your Honor, because there, again, it was women. There the women in Somalia were being targeted for female genital mutilation. Here the women are being targeted for rape. And I'll point out that in the... That proves too much. If your group is women and targeted for rape, well then anybody raped qualifies as a social group. Well, when it's done... Even if there's no, on account of, with respect to political situation, religion or whatever. I think... That's way too broad. I think it is broad, Your Honor, but I think that the court in Mohammed recognizes that in circumstances where people are being targeted because of this immutable trait, it can meet the definition of a particular social group. And, again, in Mohammed it was an entire, you know, it was all women that qualified. Now, if the court does find that there is past persecution, then it next should review the board's decision on internal relocation. The board erred on a number of respects there. The first is that it was not clear that the board... I mean, in fact, the board did not apply the proper presumption to the government. Once past persecution is established, then the government must prove by a preponderance of the evidence that, A, it's safe for the person to relocate, and, B, it's reasonable to relocate. So beyond the presumption error, there was never a discussion of whether or not it was reasonable for a petitioner to relocate. Are you asking us to remand on that issue, if we were to agree with you on imputed political opinion? On that issue and, Your Honor, on the humanitarian asylum issue as well, because that was never addressed before the board because it need not address it. Again, you know, humanitarian asylum only becomes relevant if there is a finding of past persecution because there has not yet been a finding. If this court concludes there is past persecution on account of a protected ground, then the agency must then consider whether humanitarian asylum is proper. And, again, even the government agrees that this is such a sympathetic case given the facts that occurred. If the court finds that there was past persecution, it is proper for the agency to address humanitarian asylum. Last, if the court concludes that there was no past persecution and petitioner has not met either of the nexus requirements for imputed political opinion or for social group, then the court should remand the case back to the immigration judge because petitioner was deprived of the opportunity to present her witnesses. She was deprived of the opportunity to have the telephonic testimony of her father, I'm sorry, her mother, her sister, and her daughter, all which could have gone to the heart of her issue, again, the nexus requirement. The mother could have testified regarding what happened to her older sister, Salvation, who was also raped and kidnapped for a month and then returned to the family where she eventually lost her mind because of the trauma. And that was never addressed in the declarations because it had not been presented by petitioner and because petitioner expected to be able to have the testimony of her witnesses before the court. In addition, the testimony could go towards social group because petitioner's mother and her sister could testify about other women that were targeted by the NPA. And last, it could go towards the reasonableness of internal relocation as well as whether or not it's safe for petitioner to relocate to Manila. I'll reserve my remaining time. Thank you. Thank you, counsel. Mr. Goldman. May it please the court, Dan Goldman on behalf of the Attorney General, this court should uphold the agency decision and deny the petition for review. We would agree with Ms. Salia's counsel. The facts in this case are undisputed. For the record, they are abominable. They are atrocious. And there's plenty of information that the facts are abominable and she was targeted because they knew who her father was and that had something to do with the motivation for what they did to her. The government would disagree with your characterization as to the evidence as to targeting, Your Honor. In fact, we would suggest that the evidence in this case, and as this court has recognized in numerous cases, the NPA goes after everyone. They were preying on everyone in that village. So when they meet her on the bus and they say your father was a veteran, what significance should we draw from that? You're the daughter of X, they say. I'm sorry, Your Honor? You're the daughter of X, the father. They list the father. I think they ask her who she is. And the next day they show up at the home. That's correct, Your Honor. They do. And explain to me why that isn't individual targeting as opposed to a random act of violence. To the extent that she was targeted, Your Honor, I think the only conclusion this court could draw was that she was targeted on the night she arrived. So the next night doesn't count? No, Your Honor. My understanding of the record is that she ran into these individuals at the bus stop. They asked her name. She told them her name. They figured out who she was. They showed up that night, and she was kidnapped for three days. But the only conclusion, my point there, the only conclusion that I think the court can safely draw is that they arrived that night because they knew she had arrived. The question, though, is not that. The question is whether she was targeted on account of that protected ground. And the evidence in this case, and as the court has recognized in numerous cases, in Borjan, Briones, and Lim, and in Ochave, the NPA is a terrorist organization. But they haven't raped every woman in the Philippines. No, they have not, Your Honor. And there's evidence here that she was picked out and raped because of who her father was. There's, again, Your Honor, the evidence is that she was. So this case seems to have everything that was missing in Ochave. What it has, Your Honor, the two elements that Ochave recognized, one is that it would be required that any persecution occur on account of protected ground. The other element, which Ochave did not have, this case does, is the element of knowing who the victim was. And the government doesn't contest that. They knew who she was. But what is missing in this case, as it was in Ochave, is that on-account of element. And what's relevant here and key is that the NPA was preying on that village. San Mateo Sur and all of its villagers were preyed upon, apparently for years, by the NPA. What is not in this record is evidence that Ms. Salaya's family was targeted specifically and, furthermore, that she was targeted specifically because of either an imputed political opinion or a particular social group. Your Honor, recognize that the NPA commits rapes. There's evidence in this record that there was another individual from her village who was raped and, in fact, was killed. If I'm recalling correctly, there's no evidence in the record that she had any imputed political opinion, which, again, that evidence would undercut Ms. Salaya's argument. I'm sorry, that she had any imputed? That any political opinion had been imputed to this other victim, Your Honor. And all that goes to the fact or the argument that the NPA was preying on everyone. How do you really distinguish this from Borja and Brejones? I mean, obviously you know that both Judge Trott and I sat on the case. Judge Trott wrote the decision. We sat down in courtroom one. We heard the arguments. We said on thinner evidence, I think, much thinner evidence than exists in this case, that there's enough of a mixed motive issue presented that it had to be remanded. A couple of distinctions, Your Honor. In Borja, Ms. Borja specifically told the NPA, no, I won't join you. They tried to recruit her. She resists. She says, no, I don't agree with what you're doing. Then they impose, I think they call it a revolutionary tax on her, which after a while she finally said, I can't pay this, and they went after her. So there's a distinct – it wasn't even a case of an imputed political opinion. She told them what she thought. In Brejones, you have a much higher profile target. You have someone who is known by the NPA, who's on the NPA's hit list, who's received a death threat from the NPA. On those facts alone, I think this Court can distinguish the facts in this case. In this case, there's no indication, as far as I can see in the record, and I think even Petitioner's counsel would agree, there's no indication that Ms. Celaya was a high-profile target. She was not on a hit list. A high-profile target is said to be a target. That's correct, Your Honor. But with regard to some of the arguments that were made, and Your Honor asked how the government would distinguish these cases, I think the issue of being a high-profile target does come into play. And in this case particularly, her suggestion that she can't go back even to Manila raises that concern that she was not subject in the years – and she did live in Manila for several years after this took place. She was not targeted by the NPA. There's no indication now, 25 years later, that she would be targeted by the NPA. And I want to clarify, the Board does not specifically rely on the passage of time as a reason for saying that she could go back to Manila. I'm raising that solely for the Court's consideration in that the record has to – for Ms. Celaya to prevail, the record has to compel reversal. That fact alone weighs heavily against the record compelling reversal. I want – if – Well, but the key issue really is has she established past persecution within the media? Yes, Your Honor. That's – if we disagree with the BIA on that, then we'd have to send it back in order for the BIA to apply the presumption in light of all the evidence you're talking about now, correct? Absolutely, Your Honor. If – I think as many of the other issues in this Court – this case has a number of issues in it. If this Court were to disagree and find that the record compels reversal on the nexus element, it should go back. And as we recognize in our brief, humanitarian asylum should at least be considered at the agency level if there's a finding of past persecution. But that finding has to take place before the agency can consider humanitarian asylum. Your Honor, I would like to briefly address the arguments that were raised. They were raised again here today. I think it's important for the Court to note that although Ms. Saleh did not have the opportunity to present live testimony, there was no evidence excluded in this case. Petitioners' counsel argued that today. It's been argued in their briefs that evidence was excluded. There's no evidence that was excluded in this case. The forum – – testimony is live testimony. I'm just learning about immigration law from my colleagues here. Yes, Your Honor. Help me on this. Try. How does the IJ, he or she, justify not listening to those witnesses? In this case, Your Honor, the IJ's – the immigration judge's decision to not allow telephone testimony was based on his reasoning that he could not evaluate demeanor and he could not know that the person on the other end of that telephone call was actually who she purported to be. It goes to the weight, doesn't it? It could go to weight, Your Honor, but in evaluating the issue on appeal, the question is what's the harm, what's the prejudice? Because you say that she didn't carry her burden of proof. I mean, that's the due process argument. I mean, you say you can't present these witnesses, I'm not going to hear their testimony. That's certainly their argument, Your Honor. The distinction, I think, in this case and what distinguishes this case from Zolotukin and the other cases that Ms. Salaya cites, in this case the evidence was not excluded. And there's some very significant distinctions between this case and Zolotukin. In Zolotukin, Zolotukin showed up for immigration court with counsel. They expected to call, in particular, the expert who was on the witness list. And on the day of the hearing, on the day of the hearing, the immigration judge said, no, we're not doing this over the telephone. That put Mr. Zolotukin in a tough place, having expected to bring in a lot of testimony he was without. In this case, Petitioner's Counsel, I would suggest wisely, made a motion for telephonic testimony. The immigration judge denied that, but they had ample notice as to what they had to do in terms of bringing in an affidavit. They knew what their burden was. It was not simply to show the facts of what took place, but the why as to what took place. But I don't understand your argument, then, that the testimony wasn't excluded. Certainly, live testimony was excluded, Your Honor, but in terms of evidence, Ms. Salaya has not, before the immigration judge, the board, or we suggest before this court, showed what specific facts. No offer of proof. No offer of proof. As a trial judge, isn't it easier to evaluate telephone testimony than affidavits? Maybe video is better than telephone and so on? I think, Your Honor, having practiced some trial law in the past, I don't think this court can say categorically that live testimony is always better than a written affidavit. I think there are certain distinct advantages, in fact, to presenting. Who writes the affidavits? Technically, I would say they're signed by the affiant, but certainly with counsel, Your Honor, and that presents one of the advantages. Why do you say that? I mean, in terms of evaluating demeanor, though, I think that's Judge Hogan's question. If you're looking at a piece of paper, that doesn't have a demeanor except that. . . Absolutely not. I just don't understand, and we've seen this in other cases, I just don't understand IJ's excluding evidence like this, refusing to hear experts, refusing to hear testimony. It's just easier to hear it, and then we aren't faced with the problem, and you aren't faced with coming up here and defending it. I know you weren't counsel down there, and you didn't make the motion. You didn't oppose it, but you're faced with defending it here. I just don't understand. Your Honor, I see my time has expired. If I could respond. . . A number of responses to that, Your Honor, although I'll try to keep it brief given the time has expired. The advantage, and I would agree, demeanor can't be evaluated on a piece of paper. Then again, this court can't evaluate demeanor based on a transcript. The Board of Immigration Appeals can't evaluate demeanor based on a piece of paper. And I think it's important to note in this case, the argument that was put forward before the Board by Ms. Saliha was that she needed those live witnesses, she needed that evidence to help corroborate her own testimony, particularly to overcome the adverse credibility decision. That's blurred now because we've got . . . Exactly right, Your Honor. She accomplished, by virtue of . . . Let's assume for the sake of discussion that we might disagree with you and we might conclude that past persecution has been demonstrated. What do you think we ought to do if we start from that premise? I think the case should then be remanded to the Board, certainly for the consideration of humanitarian asylum. I don't think there's any dispute in this record that what took place arose to the level of persecution, that the harm was severe, long-lasting. And that's exactly . . . I can't speak for the agency, Your Honor. I can't commit the agency to a grant of humanitarian asylum, but certainly this case raises the type of harm that should be considered for humanitarian asylum if the court disagrees with regard to past persecution. Your Honor, if I can just quickly return to the due process concerns. Again . . . I understand your argument. I guess I was making a broader point that it really does present us with some problems, and that's one of the reasons sometimes that some of our judges lack confidence in some of the IJs is that they cut off presentation of the evidence. And most of the time, I'm not sure the evidence would have added much. We don't know. I think, Your Honor, the answer to that is . . . First of all, I appreciate your concern, but I think the court has to look to the specifics of this case. Oh, sure. And in this case, no evidence was excluded. They got absolutely . . . No, he did exclude the evidence. He did exclude live testimony. I mean, there's no doubt about that. Now, whether it's prejudicial or not, I think that's what you're arguing. And as Judge Schrott noted, there was no proffer. There hasn't been a proffer as to what specific evidence as to nexus, which I think as we've all agreed is the key in this case.  Your argument's counterintuitive to what probably any trial judge thinks. How so, Your Honor? We get affidavits to anything. But if you get a witness, you can make a decision. And I'd like to see the . . . I don't want to butt into immigration law. I just want a little taste about twice a year. But I'd like to see trial judges have a chance to act like them, whether they're called immigration judges or something else. Your Honor, I understand your concern. I would . . . Well, I mean, it's nothing new in immigration law. It's a Social Security law, any administrative law. We face the same problem. If you say, well, I just don't want to hear your witness because I'd rather see an affidavit, it just is counterintuitive. And I understand that concern, Your Honor, but I think . . . I realize we have to evaluate in terms of prejudice and the kinds of the case. I'm just giving you a reaction. And I appreciate that concern. I think the distinction, though, in particular, on the Zolotukin case, and Zolotukin, and I apologize if I mispronounce that, talks in general terms, that there doesn't necessarily have to be a specific proffer as to what was said. The difference with that case and this case is, in that case, there was very specifically, the court found what evidence could have come forward and would raise for the court's consideration in Ms. Salaya's reply brief. She says, I believe on page 26, that nowhere in the Zolotukin decision is a discussion of what the evidence could have been. On the contrary, Your Honor, it's very specifically discussed in Zolotukin on pages 1075, 1076. Here's the evidence that would have come in, evidence as to past persecution of the family, evidence from the expert as to a broader context. That's what's missing in this case in order to find a due process violation. There has to be more than simply a general proffer. And, in fact, I would suggest there hasn't even been that general proffer. There hasn't been evidence proffered as to nexus. Go ahead. It's all academic if we find past persecution. I would agree. Yes. It goes back for humanitarian considerations. Somebody tries to use the telephone again, which might not be a good idea. I would defer to your characterization on that, Your Honor. So you think it's okay for an IJ to say, I'm not going to hear any evidence at all live. I'm just tender. I want an offer of proof, and I'm going to rest on that. No, Your Honor, I don't. Okay. Well, I think there are concerns that have to be addressed. I think it has to be evaluated on a case-by-case basis. In this case, certainly to exclude Ms. Saliah's live testimony I think would have been highly prejudicial, would have been error. But to exclude the testimony over the telephone from overseas where that testimony was submitted, albeit in a different form, there was no prejudice. And, again, I would note that the court, Your Honor noted the value perhaps of seeing a live witness. Again, at the board level, they're not seeing live witnesses. This court is deciding to see a live witness. And the board may have taken care of your problem by saying that we're going to find her credible. On the other hand, there's clear prejudice. We're trying to put in corroborating evidence because you think that the IJ is going to find you not credible. And the IJ denies the evidence and then finds you not credible. That's pretty harsh. But, again, as Your Honor noted, the board, I think, addressed that concern in finding her credible. Thank you, counsel. Thank you, Your Honor. Just a few quick points. The first is Zulu Tukan on the issue of prejudice. The court says explicitly we may infer prejudice even absent any allegations as to what the petitioner or his witnesses might have said if the IJ had not cut off or refused to permit their testimony. As to the issue of past persecution, just one thing to clarify. Petitioner actually arrived in the morning from the bus and was met by the NPA soldiers who then walked her home. Then later that evening, the NPA soldiers came back to the home. So, clearly, it is something that's quite distinguishable from Ochave where the rape was in an open area. And so also showing that petitioner was targeted. Also, the statement that petitioner was being tortured so that she will learn her lesson is analogous to the Ali decision where the petitioner in that case was raped and was told that she was getting what she deserved. And, in fact, Garcia-Martinez decision is clear that the rapist or the persecutor need not be explicit in the statement of why the person is being raped. Clearly, here we have enough evidence in the record to show why the petitioner was targeted. Well, didn't she say in her declaration that she heard men yelling about her father being a war veteran? She did, Your Honor. And I think that's all I have. Thank you very much. Thank you. Case just heard will be submitted. And we'll proceed to the next case on the calendar, which is Sibley 1989 Trust v. Fisher.
judges: Trott, Thomas, Hogan